# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 4, 2010 Session

## DEANA ELIZABETH CHURCH
## v.
## THOMAS NEAL CHURCH

**Appeal from the Circuit Court for Williamson County**
**No. 03306      Robbie T. Beal, Judge**

---

**No. M2009-02159-COA-R3-CV - Filed December 20, 2010**

---

This appeal involves post-divorce modification of alimony. When the husband and wife were originally divorced, the husband was ordered to pay alimony *in futuro*. At the time of the divorce, the wife was undergoing treatment for a life-threatening illness. After the divorce, the wife's treatment resulted in a dramatic improvement in her health. Meanwhile, the husband lost his job and ultimately found employment at a reduced level of compensation. Citing his decreased income and the wife's improved circumstances, the husband sought modification or termination of his alimony obligation. The trial court found a material change in circumstances, but nevertheless denied the husband's petition to modify. The husband appeals. We affirm, finding no abuse of discretion by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

HOLLY M. KIRBY, J.,, delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

David W. Garrett, Nashville, Tennessee, for Plaintiff/ Appellee, Deana Elizabeth Church.

Phillip R. Newman, Puryear, Newman, & Morton, PLLC, Franklin, Tennessee, for Defendant/ Appellant, Thomas Neal Church.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendant/Appellant Thomas Neal Church ("Husband") and Plaintiff/Appellee Deana Elizabeth Church ("Wife") were divorced in September 2004 after twenty-eight years of marriage. This is the second appeal in this case. *See Church v. Church*, No. M2004-02390-COA-R3-CV, 2005 WL 3361990 (Tenn. Ct. App. Dec. 9, 2005).

When the parties married, Wife discontinued her schooling in order to work, so that Husband could finish college. After he finished his schooling, pursuant to their agreement, Wife was the family's homemaker and Husband was the breadwinner. Along the way, Wife acquired little in the way of vocational skills. *Id.* at *1.

Husband acquired a bachelor's degree, as well as a masters in business administration. At the time of the divorce, Husband was employed as a sales manager with Caterpillar Financial Services Corporation ("Caterpillar"),[1] earning over $150,000 per year, with access to stock options. At the time of the divorce trial, Wife was undergoing aggressive chemotherapy and radiation treatments for breast cancer.

After the divorce trial, the trial court declared the parties divorced and divided the marital property. The marital estate included an ownership interest in two Sonic restaurants; this ownership interest was awarded to Husband in the divorce.

In the divorce decree, the trial court determined that Wife was financially disadvantaged due to her medical condition and lack of work experience, and awarded her alimony *in futuro* in the amount of $3000 per month until she died, remarried, or Husband reached the age of sixty-five. During the time in which Husband was required to pay alimony, he was also required to maintain a $100,0000 life insurance policy with Wife as the named beneficiary, and to pay Wife's medical insurance premium and yearly deductible until Wife reached the age of sixty-five.

Wife appealed, asserting that she was entitled to a greater share of the marital estate. The appellate court modified the divorce decree such that Husband's obligation to pay alimony would not terminate upon his reaching the age of sixty-five. *Id.* at *4. It also increased

---

[1] In some places in the record, Husband's former employer is referred to as Caterpillar, Inc. To the extent appropriate, the term "Caterpillar" is used herein as inclusive of both Caterpillar, Inc. and Caterpillar Financial Services Corporation.

Husband's life insurance obligation to $200,000. Otherwise, the decision of the trial court was affirmed. *Id*.

At some point after the parties' divorce, Husband remarried; his wife is employed by Caterpillar in Nashville, Tennessee. In August 2006, Husband underwent heart surgery, and Caterpillar put him on a two-month disability leave. Apparently while Husband was out on disability leave from Caterpillar, he purchased a condominium in Florida as an investment; this investment seems to have been made near the top of the real estate boom. After he returned to work at Caterpillar, Husband invested in a restaurant venture that eventually failed.

In February 2008, Caterpillar terminated Husband's employment. Husband asserted a claim against Caterpillar, for which he ultimately received a monetary settlement.

After his employment with Caterpillar ended, Husband undertook a thirteen-month job search. During the thirteen-month period, Husband received a payment for a one-time consulting job. He eventually found employment with LEEVAC Industries, LLC ("LEEVAC"), in Jennings, Louisiana, earning substantially less than he made at Caterpillar. Because his wife was employed in Nashville, Husband and his wife continued to live in Franklin, Tennessee, and Husband flew to Louisiana each week to work at LEEVAC.

Meanwhile, after the parties' divorce, Wife continued her treatment for breast cancer. Contrary to the expectations of her physicians at the time of the divorce, Wife's treatments were quite successful. She finished the treatments and later had no sign of recurrence of the cancer. In the wake of her recovery, Wife volunteered as a medical secretary at a missionary training center in Utah. Later, Wife became employed at a hospital, doing clerical work, for approximately thirty hours per week. For her work at the hospital, Wife started at a wage of $9.62 per hour, and later received a raise to $10.35 per hour.

In September 2008, Husband filed a petition with the trial court to modify his alimony obligation. He asserted that the loss of his employment with Caterpillar and his reduced income, coupled with the improvement in Wife's health and her ability to work, amounted to a substantial and material change in circumstances. Husband asked the trial court to modify or terminate his monthly alimony obligation, as well as his obligation to pay Wife's health insurance premiums.[2]

---

[2]The petition to modify the final decree of divorce does not mention modification of Husband's life insurance obligation. We assume that the issue was tried by implied consent.

In response to Husband's petition to modify, Wife denied any substantial and material change in circumstances. She asserted that, in addition to his salary with LEEVAC, Husband had other assets and sources of income that enabled him to continue paying the court-ordered amount of alimony. Wife claimed that the only reason for her employment at the hospital was to obtain health insurance, which was necessitated by Husband's failure to continue paying her health insurance premiums, as mandated in the final decree of divorce. Discovery ensued.

A bench trial was held on July 2, 2009. The trial court heard testimony from Husband and Wife, and the deposition of Wife's physician was admitted into evidence.

In his testimony, Husband outlined the pertinent sequence of events following the parties' divorce, including his heart surgery, his acquisition of the Florida condominium, his investment in the failed restaurant venture, and the termination of his employment with Caterpillar in February 2008. At the time of his termination, Husband said, he was earning a salary of $156,000 to $160,000 per year, plus stock options.

Husband received two one-time payments during his thirteen-month job search. First, he received a received a $47,500 payment from Caterpillar in settlement of his claim. He also received a $24,000 payment for a one-time consulting job.

Husband said that, in his employment with LEEVAC, he was earning $98,000 per year. He explained that he is unable to relocate to Louisiana because his wife is employed in Nashville, and so he bears the additional expense of commuting to and from Louisiana. Every week, Husband flies to Louisiana, stays in a rented apartment at a cost of $400 per month, and pays $110 per month in parking expenses. He said his expenses total approximately $1400-$1500 per month.

Husband testified that he still retains the ownership interest in the Sonic restaurants that he was awarded in the division of marital property. He acknowledged that he normally receives $2,750 a month in rental income from the Sonic restaurants, but asserted that, since August 2008, he had not received any income from store sales due to the restaurants' management problems. In 2004, Husband said, he received $83,680 in gross income from the Sonic restaurants, $111,380 in 2005, $103, 650 in 2006, $112,058 in 2007, and $80,250 in 2008. Husband testified that, from the beginning of 2009 to the July 2009 date of the trial, he had received only $16,500 in income from the Sonic restaurants.

Husband said that his expenses also include the mortgage on his home in Franklin[3] and the mortgage on the condominium in Florida that he purchased prior to losing his job at Caterpillar. Husband testified that he receives approximately $1,500 per month in rental income from the Florida condominium, but pays a mortgage and a line of credit totaling $3,642.88 per month, as well as $1,900 per month in homeowner's association fees. Husband explained that he would not have invested in the condominium in Florida had he known that he would lose his job with Caterpillar, and he claimed that the real estate market at the time of trial made it infeasible to sell the condominium. He also said that he had incurred nearly $10,000 in attorney fees and over $2,000 in litigation costs.

Husband acknowledged having a substantial amount of credit card debt. Husband said that he incurred expenses of some $1800-$2000 per month for dining out, including meals in Louisiana. He admitted spending $15,000 for tickets to the Nashville Predators, but said he recouped $11,000 by reselling the tickets to a third party. Husband also conceded that he spent several thousand dollars at Galaxy Golf during this time, as well as $17,814 for artwork and $13,867 for jewelry. Husband also reported a loss of $16,000 on two condominiums in Nashville, purchased for investment. Husband admitted traveling extensively for pleasure to destinations such as Mobile, Las Vegas, Chicago, New Orleans, San Diego, and Florida, and to various casinos; apparently a number of these trips occurred during his thirteen-month job search. Husband explained that he takes far fewer pleasure trips now that he has full-time employment, although he and his wife still take some weekend trips.[4]

Husband maintained that his alimony should be reduced or eliminated. He calculated that, while his alimony obligation once constituted 32% of his income, at the time of the trial, it constituted 78.5% of his income.

Wife testified as well. She said that, as of the time of trial, she had lived in Utah for approximately three years and three months. When she moved to Utah, she purchased a

_____

[3]The record does not contain the amount of the monthly mortgage payment for Husband's Franklin, Tennessee residence.

[4]Husband explained how he paid for his frequent pleasure trips, and his reasons for taking them:

> . . . I have enough [frequent flyer] miles for free trips. Currently I have about eight free trips in the bank and have a companion pass for my wife, so she flies for free. The hotels typically comp us. You know, the trips in retrospect, would I have done it differently, yeah, I probably would have. But on the other hand, in 2006, I had major heart surgery. It kind of gave me a different look at things, and subsequent to that I chose to – you know, I choose to live my life in a way that it's going to be the glass is going to be full and not empty.

He also explained, "[M]y wife likes to go places. She's young."

condominium for a purchase price of $262,500, with a total mortgage payment of approximately $1570 per month. She retained stock options and the investment account awarded to her in the divorce, although the value of these investments had diminished in the wake of market changes.

Wife claimed expenses totaling approximately $5,020 per month. These expenses included $258 per month in "miscellaneous travel and grandchildren expenses" for items such as diapers, snacks, and clothing. She said that, in 2008, she flew to Arizona two or three times to visit her sister and, in 2009, she flew to San Diego for her niece's wedding. Wife reported church contributions of $450 per month plus donations of shares of stock. Wife reported that she gave the parties' twenty-eight year old son checks totaling $6000 for college graduation and other such occasions.

Upon moving to Utah, Wife began volunteering at the Missionary Training Center for approximately thirty-two hours a week. As a volunteer, she observed potential missionaries, and sat behind a desk in a clerical capacity assisting the medical secretary. Wife described her volunteer time as "sedate," and said that she could take naps when needed. She reported that her physicians advised her, in determining her activities, "to just go by how [she] feels."

Wife testified that she found it necessary to obtain employment in order to get health insurance after her prior insurance lapsed.[5] In June 2007, Wife began working at Timpanogos Regional Hospital in the radiology department, performing clerical work. She started at a wage of $9.62 per hour, and later received a raise to $10.35 per hour, working three ten-hour days each week. Ultimately, Wife concluded that working such hours made her exhausted and ill. She reduced her work hours, although her oncologist did not require her to do so. Wife testified that she believes that the aggressive chemotherapy and radiation treatments compromised her immune system, leaving her more vulnerable to illness. Despite reducing her hours to two ten-hour days per week, she continued to get sick often. Ultimately, she resigned her position at the hospital. Wife maintained at trial that she still needed the full amount of alimony awarded to her in the divorce decree.

The deposition of Wife's oncologist was admitted into evidence. Wife first saw the oncologist in August 2006, after completing chemotherapy. The oncologist stated that, over the next ten years, there was a thirty-four percent chance of recurrence of Wife's breast cancer. The oncologist noted that Wife "has done incredibly well to this point." In more recent visits, the oncologist saw no signs of recurrence.

---

[5]The record indicates that the parties dispute who is at fault for the lapse of Wife's health insurance.

The oncologist testified that there were no restrictions on Wife's physical activities. As to Wife's reports of fatigue, the oncologist commented: "I take care of a lot of women with breast cancer who have been through therapy like she has had ... and many of them say they just can't do the things that they could before .... They don't have the stamina they once had. It can linger a while." The oncologist stated that there were no medical reasons preventing Wife from working 30 hours per week at her local hospital.

At the conclusion of the testimony, the trial judge took a recess and then issued an oral ruling. Considering the loss of Husband's long-time employment at Caterpillar and his new employment at LEEVAC in Louisiana, the trial court found a material change in circumstances. It found Husband's earning capacity to be $100,000 per year. It also found that his partnership interest in the Sonic restaurants generated $24,000 to $25,000 per year in income, with the "potential" to generate more. It declined to consider one-time payments, such as his Caterpillar settlement or his consulting fee, as part of his income for alimony purposes. The trial court also declined to consider Husband's expenses traveling to Louisiana and the expenses on his unsuccessful investment properties, noting that these losses resulted from his choices.

The trial court also found that the improvement in Wife's ability to earn money amounted to a substantial and material change in circumstances. It acknowledged Wife's concerns about her health, but found that her primary impediment to working full-time was psychological. The trial court found that Wife had an earning capacity of $20,000 to $25,000 per year.

Despite these changes in the parties' circumstances, the trial court found that there remained a significant disparity in the parties' income and earning potential, and held that Wife had a continued need for the alimony. In considering Husband's ability to pay alimony, the trial court observed that Husband's difficulty in paying the alimony resulted largely from his poor investment decisions. It commented: "The husband's lifestyle certainly didn't help his cause here. . . . I think his lifestyle is being financed on the back of credit and to some degree by his present wife, but the lifestyle hasn't really changed." In light of these factors, the trial court declined to modify Husband's $3000 per month alimony obligation, and also left intact his life insurance requirement. However, it capped Husband's liability for Wife's health insurance at $500 per month.

On September 21, 2009, the trial court entered a written order consistent with its oral ruling. In the order, the trial court acknowledged that Husband had substantial expenses associated with his poor investment decisions, but stated:

> [Husband] must live with the consequences of those [investment] decisions.
> [Wife] is not required to suffer due to his bad investment decisions. The Court

finds that if [Husband] had not made the bad investment decisions, he would have the ability to pay alimony and, moreover, [Husband] has the ability to pay the amount of alimony originally awarded – $3,000.00 per month.

Echoing the earlier oral ruling, the written order states: "The Court specifically finds the proof presented of [Husband's] lifestyle is not helpful to his request for a modification or termination of alimony." Thus, the trial court denied Husband's petition to modify, except insofar as it capped his liability for Wife's health insurance at $500 per month. The trial court held that each party was responsible for his or her own attorney fees, and assessed costs against Husband. Husband appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Husband argues that the trial court erred in declining to terminate or modify his obligation to pay alimony *in futuro* in the amount of $3000 per month, terminate or modify his obligation to pay the monthly premiums and the annual deductible for Wife's medical insurance, and/or terminate or modify his obligation to maintain a $200,000 life insurance policy to secure his alimony obligation, despite finding a substantial and material change in circumstances. On cross-appeal, Wife argues that the trial court erred in finding a substantial and material change in circumstances. Wife also asserts that the trial court erred in failing to award her attorney fees at the trial level. She seeks an award for her fees incurred in this appeal.

We review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates to the contrary. TENN. R. APP. P. 13(d); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). To the extent that the trial court's factual findings were based on its assessment of the witnesses' credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Barrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The trial court's conclusions of law are reviewed *de novo* without a presumption of correctness. *Nashville Ford Tractor, Inc. v. Great American Insurance Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005) (citing *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

Our review of a trial court's decision regarding the modification of spousal support is limited. Modification of spousal support is "factually driven and calls for a careful balancing of numerous factors." *Bogan v. Bogan*, 70 S.W.3d 731, 727 (Tenn. 2001) (citations omitted). Therefore, a "trial court is accorded wide discretion in modifying awards of spousal support . . . . 'Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes.' " *Hartman v. Hartman*, No. E2005-00010-COA-R3-CV,

2006 WL 2135454, at *4 (Tenn. Ct. App. July 31, 2006) (quoting ***Kinard v. Kinard***, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Thus, our role is to determine whether the trial court properly applied the relevant legal principles and made a decision that is not clearly unreasonable. ***Id.***

The trial court's decision on whether to award attorney fees is reviewed under an abuse of discretion standard as well. ***Richardson v. Spanos***, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005); ***Evans v. Evans***, No. M2002-02947-COA-R3-CV, 2004 WL 1882586 at * 17 (Tenn. Ct. App. Aug. 23, 2004).

### ANALYSIS

### *Substantial and Material Change in Circumstances*

We consider first Wife's argument that the trial court erred in finding a substantial and material change in circumstances since the divorce. Wife notes first that Husband is now employed at LEEVAC, making $98,0000 annually. She contends that the proof shows that, in addition to his salary, over the five-year period prior to trial, Husband received an average of $100,206 per year in income from his ownership interest in the Sonic restaurants. Wife also argues that the trial court should have considered Husband's $47,500 severance payment from Caterpillar and his $24,000 payment for a consulting job in 2009. She asserts that, even if the severance payment and consulting payment are not included, Husband's average monthly income in 2009 still exceeds his 2004 net income of $10,657.51 per month, as determined by this Court in the first appeal.

Wife also argues that, contrary to Husband's assertion, she still does not have the ability to work and earn income. She observes that the most she earned while employed was $10.35 per hour, for thirty hours per week, a total of only $16,140 per year. Wife maintains that she is unable to work due to her frequent bouts with illness, and even if she were able to work, her vocational skills still leave her financially disadvantaged in comparison to Husband.

To modify an alimony award, there must be a substantial and material change in circumstances. T.C.A. § 36-5-121(a) (2005); *accord*. ***Bogan v. Bogan***, 60 S.W.3d 721, 727-28 (Tenn. 2001) (citing T.C.A. § 36-5-101(a)(1) (Supp. 2000)); ***Wiser v. Wiser***, No. M2009-00620-COA-R3-CV, 2010 WL 2553652, at *7 (Tenn. Ct. App. June 25, 2010). "This change in circumstances must have occurred since the original award." ***Brewer v. Brewer***, 869 S.W.2d 928, 935 (Tenn. Ct. App. 1993) (citing ***Jones v. Jones***, 659 S.W.2d 23, 24 (Tenn. Ct. App. 1983)). A "substantial" change is one that "significantly affects either the obligor's ability to pay or the obligee's need for support." ***Bogan***, 60 S.W.3d at 728 (citing ***Bowman v. Bowman***, 836 S.W.2d 563, 568 (Tenn. Ct. App. 1991)). A change is material if it was not

anticipated or contemplated at the time of the original divorce. *Wiser*, 2010 WL 2553652, at *7 (citing *Bogan*, 60 S.W.3d at 728). The party seeking modification bears the burden of proving that a substantial and material change in circumstances has occurred. *Freeman v. Freeman*, 147 S.W.3d 234, 239 (Tenn. Ct. App. 2003) (citing *Seal v. Seal*, 802 S.W.2d 617, 620 (Tenn. Ct. App. 1990)).

The undisputed proof in the record shows that Husband lost his long-time employment with Caterpillar, earning over $150,000 per year, and that his new job pays approximately $100,000 per year. This is a significant decrease in the compensation Husband receives from his employment. It occurred after the divorce, and can be considered both substantial and material. *Wiser*, 2010 WL 2553652, at *7.

The undisputed proof also shows that, at the time of the divorce trial, Wife was unable to work and was not expected to regain any ability to work. However, as of the date of the trial below, Wife was healthy and had lived "beyond the expectations of her medical providers." Wife disputes the trial court's finding that she now has the ability to earn a modest income, but it appears that the finding was based in part on the trial court's implicit evaluation of the credibility of Wife's testimony that her ability to work was limited, juxtaposed against the deposition testimony of Wife's oncologist that Wife no longer had cancer and, that there were no restrictions on her activities. "We afford 'considerable deference' to the trial court's determination of credibility and the weight given to oral testimony 'because the trial court has the opportunity to observe the witnesses' demeanors and hear the in-court testimony.' " *Andrews v. Andrews*, No. W2009-00161-COA-R3-CV, 2010 WL 3398826, at *15 (Tenn. Ct. App. Aug. 31, 2010) (quoting *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 678 (Tenn. 2007)). Giving appropriate deference to the trial court's assessment of the witnesses' credibility, we find that the evidence does not preponderate against the trial court's finding that Wife now has the ability to earn some income. This fact, coupled with the undisputed reduction in Husband's income from his employment, amounts to a substantial and material change in circumstances. Therefore, we affirm the trial court's holding on this issue.

### *Modification of Alimony Obligation*

Husband asserts on appeal that the trial court erred in holding that, despite a substantial and material change in circumstances, he is not entitled to a termination or modification of his obligation to pay alimony *in futuro* of $3000 per month, the requirement that he maintain a life insurance policy of $200,000 to secure his alimony obligation, or the requirement that he pay a premium of up to $500 per month and the annual deductible for Wife's medical

-10-

insurance.[6]  He cites ***Bratton v. Bratton***, 136 S.W.3d 595, 604 (Tenn. 2004) and ***Mimms v. Mimms***, 234 S.W.3d 634, 638 (Tenn. 2001), for the proposition that the most important factors to consider in modifying an alimony obligation are the need of the disadvantaged spouse and the obligor spouse's ability to pay.

As to his ability to pay, Husband asserts that the trial court's finding that his earning capacity with LEEVAC is approximately $100,000 per year means that his earning capacity is now 62.5% of what it was when he was working at Caterpillar, earning approximately $160,000 per year.  Husband argues that, while the reduction in his income is through no fault of his own, in contrast, Wife has the ability to work but chooses not to.

Additionally, Husband disputes the trial court's finding that he receives between $24,000 and $25,000 per year from his interest in the Sonic restaurants.  He argues that the ownership interest in the Sonic restaurants was awarded to him as an income producing asset at the time of the parties' divorce, and that any income from the Sonic restaurants was not included in the determination of his income for the purpose of setting his alimony obligation in the divorce trial.  Husband contends as well that the trial court should have used net income rather than gross income figures in determining his alimony obligation, because gross income figures do not account for tax consequences.

As to Wife's need, Husband notes that Wife's health has improved and that her physician has not placed any restrictions on her work.  He highlights the trial court's finding that Wife has an earning capacity of approximately $20,000 to $25,000 per year.  He argues that Wife's necessary expenses are less than the $5020 per month she claimed at trial, and asserts that her expenses are in fact approximately $3067 per month.  Husband points out that the parties are the same age, that both have recovered from major health problems, and now neither suffers from a physical disability or incapacity due to a chronic disease.  Based on these factors, Husband argues, his alimony obligation should be terminated, or at least modified.

Even if a substantial and material change in circumstances is established, the trial court is under no duty to modify the alimony award; the party seeking the modification must demonstrate that a modification is warranted.  ***Bogan***, 60 S.W.3d at 730; ***Wiser***, 2010 WL 2553652, at *8.  In "assessing the appropriate amount of modification, if any, in the obligor's support payments, the trial court should consider the factors contained in" Tennessee Code Annotated § 36-5-121(i) "to the extent that they may be relevant to the inquiry." ***Bogan***, 60 S.W.3d at 730 (citing ***Watters***, 22 S.W.3d at 821; ***Seal***, 802 S.W. 2d at 620; ***Threadgill v.***

---

[6]In our discussion, we consider all three obligations – the monthly alimony payment, the medical insurance, and the life insurance – to be part of Husband's overall alimony obligation.  Under the facts of this case, the same arguments apply to all three parts of his obligation, and so we consider them together.

***Threadgill***, 740 S.W.2d 419, 422-23 (Tenn. Ct. App. 1987); ***Wiser***, 2010 WL 2553652, at *8. The need of the obligee spouse and the obligor's ability to pay remain relevant factors in a modification proceeding. ***Wiser***, 2010 WL 2553652, at *8. However, "while the obligee spouse's need is the central inquiry for an initial alimony award, other considerations become more prominent in a modification proceeding." ***Id.*** at *8.

In a modification proceeding, "the party seeking modification must demonstrate that it is warranted, considering the factors set out in Tennessee Code Annotated section 36-5-121(i), to the extent that they are relevant in the modification proceeding." ***Id.*** at *10 (citing ***Bogan v. Bogan***, 60 S.W.3d 721, 730 (Tenn. 2001)). In the case at bar, there remains considerable disparity in the parties' "relative earning capacity," under Section 36-5-121(i)(1). Likewise, there is a similar disparity in the parties' "relative education and training." Section 36-5-121(i)(2). Without question, the duration of the marriage was long, some twenty-eight years. Section 36-5-121(i)(3). Both parties are the same age and have suffered physical adversities. However, while Husband reacted to his heart surgery by purchasing risky investments and taking numerous trips with his new spouse, the trial court found that Wife's encounter with cancer left her with psychological impediments to functioning fully. Section 36-5-121(i)(4) and (5).

Moreover, as noted in ***Wiser***, our Legislature has underscored the need to accord appropriate respect to the role of a spouse who has functioned in the marriage as a homemaker or stay-at-home parent, thereby leaving himself or herself in an economically disadvantaged position. ***Wiser***, 2010 WL 2553652 at *11-12 (citing T.C.A. section 36-5-121(c)(1) & (2)). As a result, the spousal support statutes refer repeatedly to determining support in light of either "the standard of living enjoyed during the marriage" or "the post-divorce standard of living expected to be available to the other spouse." ***Id.*** at *12 (quoting T.C.A. sections 36-5-121(d)(2), (e)(1), & (f)(1)).

Here, it is undisputed that Wife quit her schooling to enable Husband to further his education, to her economic detriment, and that she thereafter functioned as the family's homemaker, also to her economic detriment. Further, while the record does not indicate the parties' standard of living while married, the proof shows that, despite the loss of his job with Caterpillar and the losses resulting from his poor investment choices, Husband's post-divorce standard of living clearly eclipses that of Wife.

As to Wife's need, Husband rightly notes that the proof supports the trial court's finding that Wife is capable of earning a modest income. Husband argues that Wife's claimed expenses were excessive. However, from our review of the record, and giving appropriate deference to the trial court's implicit evaluation of the credibility of Wife's testimony on her expenses, there is ample support for the trial court's conclusion that Wife's expenses are in fact what

she claims. Based on this, we find that the evidence supports the trial court's finding that Wife still has need for the amount of alimony ordered in the original divorce.

Husband vigorously disputes the trial court's finding that he still has the ability to pay the amount of alimony ordered in the divorce decree. He points to the undisputed evidence that his income from his employment is reduced. He insists that this reduction in his employment income leaves him unable to pay the amount of alimony originally awarded.

Husband also insists that the trial court erred in finding that he had income from the Sonic restaurants. Husband characterizes as "speculative" the trial court's finding that he received income from the Sonic restaurants, emphasizing the trial court's use of the word "potential" in its ruling, and citing *Mimms v. Mimms*, 234 S.W.3d 634 (Tenn. Ct. App. 2007).

First, we clarify the trial court's ruling. The trial court did not rule that the Sonic restaurants had the "potential" to generate $24,000 to $25,000 per year in income. Rather, it made a factual finding that, as of the time of trial, Husband was in fact receiving some $24,000 to $25,000 per year in Sonic income, and the restaurants had the potential to generate more than that. The trial court considered the income figures that Husband submitted into evidence, his testimony about the dearth of Sonic income in the eleven-month period preceding the trial, and Husband's testimony that anticipated expenditures to upgrade the restaurants would adversely impact the income generated from them in the future. However, the trial court also considered the evidence that, even after Husband lost his job at Caterpillar, his income from all sources permitted continued expenditures for gambling trips, luxury purchases, real estate and business investments, and the like. Weighing all of this evidence, and evaluating the credibility of the testimony of Husband, the trial court found that the Sonic restaurants continued to generate at least $24,000 per year in income. From our review of the record, and affording appropriate deference to the trial court's assessment of the credibility of the witnesses, we find that the evidence fully supports the trial court's factual finding.

Husband also argues that, even assuming the correctness of the trial court's finding that the Sonic restaurants continue to generate income, the trial court erred in considering the Sonic income in assessing his ability to pay the court-ordered alimony. He contends that, because the ownership interest in the Sonic restaurants was awarded to him in the property division in the original divorce, income produced from the restaurants should not be considered in determining whether his alimony obligation should be modified. In support, he cites *Norvell v. Norvell*, 805 S.W.2d 772 (Tenn. Ct. App. 1990). In *Norvell*, in the parties' divorce, the wife was awarded the marital home. After the divorce, she sold the marital home, moved to a smaller residence near her children, and invested the remaining proceeds from the sale. The husband asserted that the wife's income from those proceeds should be deemed a "change in circumstances" that warranted modification of his alimony obligation. This was rejected. The

-13-

*Novell* court stated: "Any income produced from the proceeds of the sale of the parties' marital home awarded to a spouse in the division of marital property should not be a factor in determining whether or not a change of circumstances existed to warrant a modification of periodic alimony payments." *Id.* at 775. Thus, the issue in *Norvell* was whether the wife's sale of the marital home and use of the proceeds was a change in circumstances, not whether income from an investment property interest should be considered in determining the obligor spouse's ability to pay support. Therefore, Husband's reliance on *Norvell* is misplaced.

Husband also asserts repeatedly that the trial court in the original divorce decree did not include the income from the Sonic restaurants in determining his alimony obligation. However, in the September 2004 final decree of divorce, there is no discussion of Husband's income from Caterpillar or any other source, including the Sonic restaurants. There are no documents in the record before us indicating clearly whether the trial court in fact considered Husband's income from the Sonic restaurants in setting the original alimony obligation. Of course, Husband, as the appellant in this matter, has the "...burden to supply a complete and accurate record on appeal." TENN. R. P. 24(b); *Nichols v. State*, No. W2009-00590-CCA-R3-PC, 2010 WL 669225 at *5 (Tenn. Crim. App. Feb. 25, 2010). He has not furnished this Court with a record that supports his assertion.

However, regardless of whether the trial court in the original divorce proceedings considered the Sonic restaurants income in setting Husband's alimony obligation, the trial court in this modification proceeding is not precluded from doing so. T.C.A. § 36-5-121(i)(1) lists "[t]he relative earning capacity, obligations, needs, and financial resources of each party, including income from pension profit sharing or retirement plans and *all other sources*," as a relevant factor to be considered in determining an award of alimony. T.C.A. § 36-5-121(i)(1) (2005) (emphasis added). Of course, this applies with equal force in the trial court's consideration of a request to *modify* alimony. *Von Togen v. Von Togen*, No. M2009-00850-COA-R3-CV, 2010 WL 891893, at *9 (Tenn. Ct. App. Mar. 12, 2010) (quoting *Bogan*, 60 S.W.3d at 730).

As we have previously noted, "this Court is not so much concerned with a reduction in income from one source as it is concerned with whether Petitioner has sustained a significant change in his income from *all sources*." *Killian v. Killian*, No. M2010-00238-COA-R3-CV, 2010 WL 3895515 at *4 (Tenn. Ct. App. Aug. 27, 2010) (emphasis in original). We find no error in the trial court considering Husband's income from all sources, including the Sonic restaurant income, in its assessment of whether Husband still had the ability to pay the amount of alimony originally awarded.

Husband argues that the trial court did not use his net income figures, and thus must not have considered his tax consequences. The trial court had these figures available, and there is nothing in the record indicating that it was unaware of Husband's tax circumstances.

-14-

Husband contends overall that the proof shows that he no longer has the ability to pay the amount of alimony ordered in the divorce decree. Certainly the proof shows changes in Husband's employment and his expenses, including expenses from his unfortunate investment choices. However, in weighing the evidence, the trial court stressed the fact that, despite these changes, Husband's lifestyle had changed very little. This is an appropriate consideration. The evidence showed that, even after Husband lost his Caterpillar job, and after his real estate and other investments proved ill-fated, his pleasure trips, gambling trips, and purchase of luxury items continued virtually unabated. Even if Husband's lifestyle is being financed by his liberal use of credit cards, his decision not to curtail these expenditures clearly undercuts his protestations that he is unable to pay the court-ordered amount of spousal support.

As noted above, we review the trial court's decision on Husband's petition to modify his alimony obligation under an abuse of discretion standard. *Wiser*, 2010 WL 2553652, at *7; *Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999) (citing *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)). Under the abuse of discretion standard, the trial court's decision is affirmed "so long as reasonable minds can disagree as to the propriety of the decision made." *Andrews*, 2010 WL 3398826, at *16 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). This Court is not permitted to substitute its judgment for that of the trial court. *Andrews*, 2010 WL 3398826, at *16. From our review of the record, we find no abuse of the trial court's decision to decline to modify Husband's $3000 per month alimony obligation, his obligation to pay for Wife's medical insurance, or his life insurance requirement.

### *Attorney Fees*

Wife asserts on appeal that the trial court erred by not awarding her attorney fees at the trial level. She argues that she was forced to incur attorney fee expenses in order to respond to Husband's attempt to terminate or modify his alimony obligation. Wife's point is well-taken. However, on appeal, the trial court's decision on whether to award attorney fees is also reviewed under an abuse of discretion standard. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995). Reversal of the trial court's decision to deny Wife attorney fees at the trial level should occur "only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Richardson*, 183 S.W.3d at 729 ( citing *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177,182 (Tenn. 2001)). Reviewing the record as a whole, we find no such abuse of discretion. Therefore, we affirm the trial court's denial of Wife's request for attorney fees at the trial level.

On appeal, Wife also requests that she be awarded her attorney fees in defending this appeal. An award of appellate attorney fees is a matter that is within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In considering a request for attorney fees on appeal, we consider the ability of the party seeking the fee award to pay such fees, his or her success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharacholu*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050 at *16 (Tenn. Ct. App. July 19, 2005). Considering all of the relevant factors in this case, Wife is awarded her reasonable attorney fees incurred in this appeal. The cause must be remanded to the trial court to determine the appropriate amount of attorney fees for this appeal.

## CONCLUSION

The decision of the trial court is affirmed, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are taxed to the Appellant Thomas Neal Church and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE