IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 10, 2013 Session

## MARY ANN LAYMAN v. THOMAS STUART LAYMAN

**Appeal from the Circuit Court for McMinn County**
**No. 27653      Lawrence H. Puckett, Judge**

_____

**No. E2013-00429-COA-R3-CV-FILED-MARCH 28, 2014**

_____

In this divorce case, the trial court granted Mary Ann Layman ("Wife") an absolute divorce from Thomas Stuart Layman ("Husband"), thereby ending the parties' twenty-nine year marriage. Subsequently, the court divided the marital property and awarded Wife alimony in futuro and child support in a lump sum amount. Husband appeals. We reverse the trial court's award of $63,200 in retroactive child support. The judgment is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed in Part and Affirmed in Part; Case Remanded**

CHARLES D. SUSANO, JR., C.J. , delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellant, Thomas Stuart Layman.

Michael E. Jenne, Cleveland, Tennessee, for the appellee, Mary Ann Layman.

**OPINION**

I.

The parties were high school sweethearts. They married in 1983. By 1985, both had earned college degrees from Tennessee Wesleyan College. Husband attended medical school in Memphis while Wife, an elementary school teacher, worked to support the family. Three children were born to their union: a son, James, in 1987; a son, Ryan, in 1989; and a daughter, Elizabeth, in 1992. As was agreed to by the parties, Wife became a stay-at-home

mother after their first child was born. In 1995, Husband completed a six-year residency and became a general surgeon.

In 1995, the parties returned home to McMinn County. For the next twelve years, from 1987 to 1999, Wife remained at home with the children. Husband's long work hours led to problems in the marriage. By 1998, the couple had sought marital counseling. Wife returned to teaching during the period from 1999 to 2005, earning between $26,000 and $28,000 a year. She was able to save most of the money she earned.

As the trial court put it, Husband began earning "good money" after he completed his residency. Between 2000 and 2008, Husband's annual income ranged from $349,318 to $585,921. In the three years prior to trial, Husband earned an average of just under $400,000 a year. The court observed that the financial success Husband and his medical practice attained "took a lot of effort and . . . a lot of sacrifice by both [parties]."

In 2005, after she began experiencing foot pain, Wife resigned her teaching position. Husband worked constantly and she felt "overwhelmed" and "very harried" trying to meet all of the children's needs by herself. In 2006, Wife had surgery to cut out a wart on the bottom of her right foot. The resulting scarring left her with chronic foot pain. She received steroid injections and took pain medication. However, she continued to experience pain and found it difficult to stand, walk, or engage in weight-bearing activities. Wife had two more foot surgeries in 2007 and 2011. Despite wearing only athletic shoes with an orthotic insert, Wife could not stand for more than an hour. Her inability to use her right foot resulted in muscle atrophy to her calf. Wife also suffered with chronic back pain. An MRI in 2008 revealed "advanced degenerative disc disease" and a bulging disc that left her unable to lift items or bend over. Other than a brief, part-time employment during the period of 2010 to 2011, Wife did not again return to work. Husband underwent two knee surgeries and was admittedly overweight but otherwise in good health.

As the years passed, Husband's long hours at work caused great friction in the marriage. Husband conceded that at times he worked up to 120-130 hours a week and admitted, "I really live[d] in the hospitals." Wife felt alone. She lived as if she were a single parent. She noted that, in 2007 alone, Husband did not come home from the hospital at all on 134 nights. Husband admitted that Wife had threatened for years to leave him if he didn't cut back on work and spend time with his family. Husband admitted that he chose work over his marriage.

In January 2008, Wife filed a complaint for divorce. In his answer, Husband denied that the parties had separated and denied that Wife was entitled to any of the relief requested. Following the filing of the complaint, Husband usually deposited $3,000 a month into the

parties' joint checking account for the purpose of paying the bills. Husband also paid for credit card charges and other bills Wife brought to his attention. According to Husband, at some point, he and Wife met, together with their attorneys, "and it was agreed that he was satisfying his financial obligations to his family." Wife testified, however, that she struggled to pay the household expenses because Husband sometimes forgot to make a monthly deposit and, furthermore, according to her, his deposits did not cover all of the household expenses. When Wife filed her divorce complaint, the two younger children were still at home. In order to pay all of the monthly expenses, Wife was forced to take out $35,000 from a CD. She also testified that she had borrowed money from her mother.

Husband continued to come home after the divorce was filed, but did so "less and less." In June 2008, Husband purchased and moved into a house on Fairview Avenue near the hospital. The proof was to the effect that it cost roughly $5,000 a month to run the marital household. In January 2010, following a hearing, Husband agreed to court-ordered support payments of $4,336 per month.

For some five years following the filing of the complaint, the case lingered in court, marked by a series of delays – multiple continuances, contempt filings and additional hearings which were largely attributable to the failure of Husband and/or his first attorney to provide the information required to complete the complex valuation of Husband's medical practice and related interests. While the trial court ultimately found that Husband was not in willful contempt of its orders, it observed at one point that he "has made a mockery of every order I've ever put down requiring him to provide information for purposes of an evaluation. . . ." A four-day bench trial was finally held in September 2012. By then, all three children were emancipated.

Following trial, the court awarded Wife an absolute divorce on the stipulated ground of inappropriate marital conduct. After awarding each party that party's separate property, the court divided the marital assets; there was no real marital debt. Husband was awarded his separate estate valued at approximately $650,000. Wife's separate property was not valued, but included her jewelry and various pieces of furniture. The court essentially divided the marital property equally, resulting in an overall award of $2,011,255 to Wife and $2,020,900 to Husband. Wife's award included, among other items, the marital home, $648,112 in retirement funds, and unrestricted liquid assets totaling $451,303. Husband was awarded the Fairview Avenue property, the value of his medical practice and related business properties and interests, personal accounts, and an option to purchase a portion of the farmland surrounding the marital home. The court ordered Husband to pay alimony in futuro of $7,500 a month. The court further awarded Wife "retroactive" child support of $63,200. With Wife's agreement, the court dismissed all pending allegations of civil and criminal contempt against Husband.

In post-trial proceedings, the court awarded Wife $21,895.60 in attorney's fees and expenses and $4,673.15 in discretionary costs. Husband subsequently exercised his option to purchase a portion of the acreage on which the marital home was located. As a result, Wife received an additional $279,440 in cash following the divorce.

Husband filed a motion to alter or amend. The court reduced the award of attorney's fees to Wife by $2,500, resulting in a judgment for $19,395.60. The court otherwise denied Husband's motion. Husband timely filed a notice of appeal.

## II.

Husband raises the following issues:

> 1. Did the trial court err in ordering Husband to pay alimony at the rate of $7,500 per month in light of the evidence presented at trial?

> 2. Did the trial court abuse its discretion in its award of alimony in futuro to Wife?

> 3. Did the trial court err in its award of "retroactive" child support?

As an additional issue, Wife seeks an award of attorney's fees on appeal.

## III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's conclusions of law. **Kendrick v. Shoemake**, 90 S.W.3d 566, 569 (Tenn. 2002); **Campbell v. Florida Steel Corp**., 919 S.W.2d 26, 35 (Tenn. 1996).

We review the trial court's award of alimony mindful of the following familiar principles:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion.

*Hickman v. Hickman*, E2013-00940-COA-R3-CV, 2014 WL 786506 at *3-4 (Tenn. Ct. App. E.S., filed Feb. 26, 2014) (*quoting Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105) (internal citations and footnote omitted); *see also Jekot v. Jekot*, 362 S.W.3d 76, 79-80 (Tenn. Ct. App. 2011); *Church v. Church*, 346 S.W.3d 474, 481-82 (Tenn. Ct. App. 2010)). As with spousal support, determinations regarding child support are reviewed under an abuse of discretion standard. *Ramsey v. Ramsey*, E2012-01940-COA-R3-CV, 2013 WL 5827648 at *3 (Tenn. Ct. App. E.S., filed Oct. 29, 2013)(citing *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1987); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005)). "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *Id*. (citing *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000)).

IV.

A.

Taken together, Husband's first two issues challenge the type and amount of the alimony award. Husband does not dispute that Wife is entitled to some form of spousal support. He submits, however, that the award of alimony in futuro should be replaced with an award of finite alimony – either rehabilitative or transitional. Husband further seeks a reduction in the amount of the alimony award – from $7,500 a month to an amount that is "reasonable" after giving due regard to Wife's stated expenses and her capacity for additional earnings from the liquid assets she was awarded in the court's division of the marital estate. As we have observed, a trial court is accorded wide discretion regarding matters of spousal

support. Such discretion extends to the determination of "whether spousal support is needed and, if so, the nature, amount, and duration of the award." **Gonsewski,** 350 S.W.3d at 105. We proceed mindful that our role is to "presume that the decision is correct and . . . [to] review the evidence in the light most favorable to the decision." **Id**. at 105-06.

B.

Husband's "alimony" issue causes us to focus on three types of alimony: alimony in futuro, rehabilitative alimony, and transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1).[1] An overview of each form of alimony is found in **Gonsewski**. We quote relevant portions of the Supreme Court's opinion therein as follows:

> The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36-5-121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." Alimony in futuro is appropriate when
>
>> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.
>
> Tenn. Code Ann. § 36-5-121(d)(1).
>
> *   *   *
>
> In contrast to alimony in futuro, rehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. See Tenn. Code Ann. § 36-5-121(e)(1).

---

[1]Alimony in solido is not implicated by the issues raised by Husband.

* * *

[T]ransitional alimony. . . is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36-5-121(d)(4), (g)(1). Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's capacity for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. As such, transitional alimony is a form of short-term support.

* * *

The statutory framework for spousal support reflects a legislative preference favoring short-term spousal support over long-term spousal support, with the aim being to rehabilitate a spouse who is economically disadvantaged relative to the other spouse and achieve self-sufficiency where possible.

*Gonsewski,* at 108-09 (additional internal citations omitted).

Succinctly summarized, rehabilitative alimony is "intended to assist an economically disadvantaged spouse in acquiring additional education or training" to achieve a higher standard of living, *id.*, at 108, while transitional alimony instead is awarded "when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce . . . ." Tenn. Code Ann. § 36-5-121(g)(1). Alimony in futuro should be awarded "only when the court finds that economic rehabilitation is not feasible and long-term support is necessary." *Gonsewski*, at 109. In addition to the above-stated principles, a trial court is further guided in its alimony

determination by reference to the list of statutory factors set out in Tenn. Code Ann. § 36-5-121(i).[2]

---

[2]The statute provides:

> (i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
>
> (7) The separate assets of each party, both real and personal, tangible and intangible;
>
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
>
> (9) The standard of living of the parties established during the marriage;
>
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
>
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
>
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Returning to the present case, the trial court began its analysis as follows:

> [O]n alimony, to say what kind of alimony . . . . What is the
> purpose of in futuro alimony? [T]he purpose of it is if you had
> an economically disadvantaged spouse who is incapable of
> rehabilitation, you're supposed to award in futuro alimony. . . .
> It's to compensate a spouse who cannot be rehabilitated.

Citing this Court's decision in *Jekot v. Jekot,* 232 S.W.3d 744, 752 (Tenn. Ct. App. 2007), the trial court expressly acknowledged, however, "that there's a [statutory] preference for rehabilitative alimony when one is found to be economically disadvantaged," as provided in Tenn. Code Ann. § 36-5-121(d)(2). That section states:

> It is the intent of the general assembly that a spouse, who is
> economically disadvantaged relative to the other spouse, be
> rehabilitated, whenever possible, by the granting of an order for
> payment of rehabilitative alimony. To be rehabilitated means to
> achieve, with reasonable effort, an earning capacity that will
> permit the economically disadvantaged spouse's standard of
> living after the divorce to be reasonably comparable to the
> standard of living enjoyed during the marriage, or to the
> post-divorce standard of living expected to be available to the
> other spouse, considering the relevant statutory factors and the
> equities between the parties.

The trial court continued its analysis:

> Now, let's look at, what does it take to be economically
> disadvantaged under the statute? I think the facts in this case
> fall within that.

The court then recited the following provisions of Tenn. Code Ann. § 36-5-121:

> (c) (1) Spouses have traditionally strengthened the family unit
> through private arrangements whereby one (1) spouse focuses
> on nurturing the personal side of the marriage, including the care
> and nurturing of the children, while the other spouse focuses
> primarily on building the economic strength of the family unit.
> This arrangement often results in economic detriment to the
> spouse who subordinated such spouse's own personal career for

the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

(2) The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Finally, the court expressly considered each of the relevant statutory factors and made extensive findings as follows:

The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit-sharing or retirement plans, and all other sources.

Certainly, as far as being able to live at the same level as [Husband] will live post-divorce, . . . or maintain the same level, they don't spend a lot of money but she shouldn't be deprived of the opportunity to handle those assets in the way she needs to by suffering a loss of assets through her own need of support in the future.

[T]he earning capacities are vastly different. I don't know if she can work at all, whereas I know he's going to earn three hundred fifty, four hundred thousand dollars a year most years.

The relative education and training of each party and ability of each party and their opportunity to secure education and training, well, she's educated, but I don't know if her health is going to allow her to go back to the job that she's educated to

-10-

do. And she does have these health problems that are documented.

This marriage is a twenty-nine-year marriage. They have been partners in a partnership that has been very successful.

She gets full credit for her contribution to the intangibles, as well as the fact that financially at times during this marriage, she was the one who bore the brunt of the financial aspects in the marriage early on.

The age and mental condition of each party, I've already dealt with that.[3]

\*    \*    \*

The physical condition of each party, I've dealt with that.

\*    \*    \*

The separate assets would be part of both real and personal, tangible and intangible. She's got a sizable estate coming out of this partnership, but that doesn't obviate the fact that she's still economically disadvantaged. . . .

The provisions made with regard to the marital property, I've taken that into consideration. . . .

The standard of living of the parties established during the marriage, well, . . . money was no object and no concern, . . . in this marriage because there was plenty of it. That doesn't mean they were irresponsible. . . . But neither should [Wife] be worried about money in the future with her award of support and also that estate that she's getting.

---

[3]Within its earlier findings related to the division of the marital assets, the trial court noted the parties' respective ages and found that Wife had "significant health problems," while "[Husband's] health appears to be sound, and he's going strong." No mental health issues were present as to either party.

The extent to which each party had made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions to the education, training, or increased earning power of the other party, . . . I've made a sufficient finding of fact on that already.

The relative fault of the parties . . . I don't find it appropriate to do so in this case.

The tax consequences to each party as are necessary to consider the equities between the parties, [plaintiff's counsel] mentioned the tax consequences [to Wife on her receipt of alimony], which I think I have to consider.

So the award of alimony will be in futuro. And I think the seventy-five hundred dollars a month is a fair amount. If the needs go up or the needs go down, it can be modified. Twenty-nine years.

(Footnote added.)

C.

On the evidence presented at trial, we reject Husband's argument that the trial court should have awarded Wife either rehabilitative or transitional alimony rather than alimony in futuro. Rehabilitative alimony is not appropriate in this case. Wife is college-educated and worked for some years as a teacher. By agreement of the parties, however, she left her profession to raise the parties' three children and tend to the household while Husband worked virtually non-stop. In later years, her efforts to return to work were hampered by chronic foot and back problems that prevented her from standing or walking for long periods. "Rehabilitation" as defined in Tenn. Code Ann. § 36-5-121(d)(2) is simply not in Wife's future.

We also conclude that transitional alimony is not in order. Wife's situation does not fit within the concept of an "economically disadvantaged spouse [who] needs assistance to adjust to the economic consequences of a divorce . . . ." Tenn. Code Ann. § 36-5-121(g)(1).

Husband does not dispute that Wife suffers from chronic foot problems and has a "bad back," but argues she is not permanently incapacitated from all work activity. He takes the

-12-

position that Wife is at least capable of working at a "sedentary activity that does not involve excessive standing or walking." He points to the fact that, at the end of 2010, Wife worked as a part-time reading interventionist. The proof further shows, however, that in this position, Wife worked approximately three hours a day, or fifteen hours a week at $25 an hour. She was unable to return to this work following her third foot surgery, and had not worked again as of the time of trial. Among its findings,[4] the trial court stated, in part:

> I'm crediting that testimony and those records that have been admitted to substantiate that [Wife's] health is not very good. As far as going back to a teaching position, it's probably not a very good prospect that she'll do that or be able to do that.

> *   *   *

> She's intelligent, but . . . everybody knows that teachers don't get paid what they should be paid. . . . and . . . her [earning] capacity is not very great at all.

(Footnote added.)

In our view, evidence that, in the two years before trial, Wife worked for about four months and earned a gross income of some $375 a week does not cause the totality of the evidence to preponderate against the trial court's finding that Wife is an economically disadvantaged spouse who cannot be rehabilitated as that term is statutorily defined. The proof does not preponderate against the trial court's findings as to the issue of the type of alimony in this case. Wife is entitled to long-term spousal support in the form of alimony in futuro.

### D.

We next consider the *amount* of the alimony award. At trial, Wife submitted a list of expenses totaling $5,268.50 a month. She agreed that, after she filed for divorce, Husband usually deposited $3,000 a month into their joint account to pay bills, although "there were months when he forgot." In October 2008, Wife's then-counsel wrote a letter to Husband's counsel advising that "if [Husband] does not start making regular deposits, we will have no

---

[4]The findings appear within the court's explanation of the division of the marital property.

choice but to go forward with an APL"[5] hearing. Wife conceded that Husband also paid the charges on a joint credit card, but added that she closed the joint credit card account shortly after she filed the complaint. Wife said, "I was having to supplement, the first two years especially, what I was getting." She testified that with two teenagers living at home, she "just . . . couldn't pay all the bills" and that, in addition to the money Husband provided, she used $35,000 from a CD to supplement her spendable funds.

The matter of support for Wife's household was addressed at a December 2009 hearing. As Husband's former attorney put it, Wife was "wanting additional funds for her to live on." Counsel continued:

> [T]he prior arrangement . . . was [Husband] was paying her $3,000 a month . . . and he was paying her credit card bill, whatever it was . . . .
>
> At some point . . . [Wife] decided to cut up that credit card . . . and close that account, . . . because . . . that was a joint account . . ., so she could establish credit in her own name.
>
> So I suppose that created a personal shortfall for her . . . and [Husband], I told him what they wanted and he said, Okay, I'll pay that. And he's been paying it since.

Although Wife testified at that same hearing "[t]hat's been working good," she stated that the amount Husband paid was still not enough to cover the monthly expenses even though only she and Elizabeth then lived at home. Wife said she was unable to afford prescribed physical therapy and had recently stopped taking a prescription painkiller because it cost $300 a month. She had not been able to continue tithes to her church. Entries for these expenses, such as $500 for medication and a $200 tithe are included in Wife's expense statement. Wife did not include the cost of a new vehicle in her budget, but testified she would likely need to replace the van she drove as it was approaching 100,000 miles. Wife had not gone on any trips or taken a vacation during the pendency of the divorce, but conceded that her health, in addition to her budget, would have prevented significant walking and other activities. Finally, Wife budgeted $430 a month for "income tax and accountant fees" which she submits in her brief "is not enough [to cover] taxes for an alimony award of $7,500[ ] per month, or $90,000[ ] per year, under our tax system." As to the amount of

---

[5]The context indicates that counsel is referring to a hearing on Wife's pending motion for temporary support, or "alimony pendente lite."

-14-

additional income she can expect to generate from the liquid assets she received, Wife notes that nearly 60% of the assets she was awarded are already in retirement funds.

For his part, Husband testified that he was "still paying all the bills" after the parties separated. He added that when the parties and their former attorneys met, "the agreement was that I was meeting the needs for the wife and children fine." Husband said that, in addition to the $3,000 a month, he was "paying the credit card bills," and "usually" paid other bills Wife sent to him, *e.g.*, home repairs. According to his income and expense statement, Husband averaged a gross monthly income of $32,824. After taxes and contributions to his 401(k), his take-home pay is $20,419.33 a month. Husband listed monthly expenses totaling $14,913.06, which included the $4,336 temporary alimony payments and $5,000 a month that he routinely deposited into investment accounts he established for each of the children. The evidence reflected that the children had used the money in the Schwab accounts Husband set up for them to pay their education expenses and other major purchases such as cars. Wife suggests that Husband need not continue adding money to the accounts since James and Ryan were in the last years of medical school, Elizabeth was a senior in college, and their accounts maintained a $100,000 balance. Wife suggests that eliminating this $5,000 deposit and substituting the alimony in futuro payment for the former, temporary support payment brings Husband's total monthly expenses to $13,077.06. After payment of all expenses, including alimony, Husband has $7,342.27 left each month.

The trial court found that Wife was entitled to alimony in futuro of $7,500 a month. At the outset, the court properly considered Wife's needs and Husband's ability to pay. With respect to alimony, the "real need of the [disadvantaged] spouse . . . is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 593 (Tenn. Ct. App. 2012)(quoting *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995)). With respect to the tax consequences of the award, the trial court acknowledged Wife's position that the stated $5,268.50 was the *minimum* amount Wife required to meet her expenses. The trial court replied, "So you're basically extrapolating the fact that the fifty-three hundred dollars, she's going to have to pay tax on. So you need enough for her to really have that net – that's a net." In announcing its ruling, as set out above, the court expressly stated it had considered counsel's argument regarding the tax consequences of the alimony award. In light of all of the evidence, the court concluded that $7,500 a month was "fair."

It is clear beyond any doubt that Wife is "economically disadvantaged" relative to Husband. His average income was just under $400,000 a year for the three years prior to trial. He had earned as much as $585,921 a year. As a practical matter, Wife, in her present state of health, has no earning capacity. There was no proof of significant income from her non-retirement liquid assets. When you examine the pre-separation standard of living of

-15-

these parties, two things jump out: they lived in a relatively frugal way and saved a lot of money. When Wife taught, she saved most of her annual income of $26,000 to $28,000. Clearly, saving money was a big part of their standard of living. Her *minimum* list of expenses totaled $5,268.50 but there are other significant factors to consider. Wife used $35,000 out of a CD to supplement Husband's support; the $5,268.50 does not include any savings, which, as previously stated, was a significant part of the parties' standard of living; Wife's calculation of taxes was based on an alimony figure some $2,000 less than the trial court's final award; and she was unable to afford prescribed physical therapy, prescription painkillers, and contributing to her church as in years past. The evidence does not preponderate against the trial court's award of alimony in futuro of $7,500 until death or remarriage.

V.

A.

Husband asserts that, under the facts established at trial, the trial court erred in awarding $63,200[6] in retroactive child support. He essentially contends that, from the time the divorce proceedings began, he continued to support Wife and the children, as always, and no further support is due.

In considering an issue of child support, this Court "start[s] from the proposition that parents have a legal duty to support their children." ***Sykes v. Sykes***, M2012-01146-COA-R3-CV, 2013 WL 4714369 at \*2 (Tenn. Ct. App. M.S., filed Aug. 28, 2013)(citing Tenn. Code Ann. § 34-1-102.). Moreover, the Supreme Court has observed that "[a]llocating a certain amount of financial support to one's children is a mandatory obligation, not a fundamental right. As such, parents have no fundamental right to allocate support to their children as they see fit." ***Id.*** (quoting ***Gallaher v. Elam***, 104 S.W.3d 455, 461 (Tenn. 2003)). At the same time, the intention behind the statutes and regulations pertaining to child support is to "assure that children receive support reasonably consistent with their parent or parents' financial resources." ***Id***. (quoting ***State ex rel. Vaughn v. Kaatrude***, 21 S.W.3d 244, 248-49 (Tenn. Ct. App. 2000); see also Tenn. Comp. R. & Regs. 1240-02-04-.01(3)(e)).

In the case before us, the trial court stated the following after the trial:

---

[6]In its bench ruling, the court awarded back child support "at sixty-two thousand two hundred dollars." The judgment filed on October 19, 2012, awards $63,200. We have used the amount reflected in the judgment.

You know, we don't have an [child support] order down, and it's been mentioned that there was a support order down for forty-three hundred dollars at some point. But I believe I have to award child support because in Tennessee, . . . both parents have an obligation to maintain and support the children.

Her needs that she's put on her expense list even now are fifty-three hundred dollars a month, and she was only receiving forty-three hundred at that time. Now, she had access to her own money, which I'm sure she did use some to help her get through. But . . . there's no dispute that she's been the primary parent of these children during the time that they were a minority while this case was going, on, but that she be [sic] entitled to child support.

Further, the court expressly found that "[Husband] removed himself from the marital residence Feb. 1, 2008 and child support began on that date."

In January 2008, together with the complaint, Wife filed a pleading styled as a "Motion for Residential Parenting Responsibilities, Setting of Child Support Pendente Lite, Exclusive Use of the Marital Residence, and Temporary Alimony." Thereafter, the parties continued for a time under their usual arrangement whereby Husband was largely absent from the home but provided money and paid bills for the household expenses. When the complaint was filed, Wife lived at home with Ryan, who was already eighteen but still in high school,[7] and Elizabeth who was still a minor. In any event, nearly two years passed before Wife, in December 2009, actively pursued additional support of any type.[8] An order was entered on January 10, 2010, announcing, among other matters, the parties' agreement regarding "temporary support." The order states:

[Husband] shall pay [Wife] as temporary support the sum of $4,336.00 per month by depositing the same into the parties' joint checking account for [Wife's] use. [Wife] shall account for the spending of these proceeds by providing to [Husband] copies of her bank statements within ten (10) days from receiving the same.

_____

[7]He graduated in May 2008.

[8]The hearing transcript is not before us.

-17-

By the time of the order, only Elizabeth, then an eighteen-year-old senior in high school, remained at home with Wife.

B.

Against this backdrop, Husband first asserts that "it is improper to charge one parent with a child support arrearage in cases where both parents and the children are living together and expenses are being paid." Husband thereby disputes the trial court's finding that he vacated the marital residence and the parties separated in February 2008. He asserts that after Wife filed the complaint, his residential schedule was not much different than it had always been in that he and Wife were still "together," but he spent the majority of his time in at the hospital. At trial, Husband was asked how long he and Wife continued to live together after the divorce filing. Husband testified, "It was probably half a year . . . well, until I bought the house at Fairview Avenue, we continued to live together." Husband thus takes the position that he and Wife did not actually separate until June 2008, when he moved into another home. Wife's testimony was slightly different. During cross-examination, she testified as follows:

[Counsel]: Talking about your separation, when did that occur?

[Wife]: Well, after I filed for divorce, he came home less and less.

* * *

Q: [W]hen did you-all separate?

A: There's not a time that we said, okay, we're separating. All I know is that he came home less and less. And then he called me – it was to the point where he wasn't coming home but maybe two or three time during, like, April and May of '08. And then in June, he called me and said that he was going to buy [the Fairview Avenue] house . . . . And I assumed that he was going to be living there.

* * *

Q: January 22nd, 2008, was when this divorce was filed.

A. Yes.

-18-

Q: Are you saying that you continued to live together after the divorce was filed?

A. Yes – well, he would come home some nights. Over the course of the next – up through – sometime in April – if I had to declare a time that we were separated and he stopped coming home, it would be sometime in April, I think, that he just did not come home anymore.

We conclude that the evidence preponderates against the trial court's finding that, for child support purposes, the parties separated in February 2008. Even assuming that the trial court credited Wife's testimony over Husband's, there is little dispute that it was after May before Husband stopped coming home altogether and June when he purchased and moved into another home. In view of the evidence, we conclude that the parties separated effective on or about June 1, 2008, and any child support obligation began as of that date.

C.

We next consider Husband's argument that no child support is due because he continued to pay all of the expenses since the case began. In the same vein, Husband asserts that the 2010 temporary support order must be presumed to have addressed both temporary alimony and temporary child support from that point forward. We agree.

As discussed in the preceding section, the proof showed that it cost roughly $5,000 a month to run the marital household throughout the marriage. From June 2008 through December 2009, Husband paid $3,000 a month plus credit card and other bills. He also paid for his children's education and continued to put money in each of the children's Schwab accounts.

Thereafter, Wife requested increased support to meet expenses. Following a hearing, an agreed order was entered providing that Husband would pay Wife $4,336 a month in "temporary support." We agree with Husband's position that these court-ordered support payments which began in January 2010 were intended and received as sufficient temporary support from that point on for Wife *and the children*. Throughout the pendency of the case, Husband also continued his practice of financing their educations and other major expenses with regular contributions of $20,000 a year to each child's individual Schwab account. Again, Wife saw no apparent need to pursue additional support for herself or the children until some two years after the case began. At that point, it was agreed that Husband would pay $4,336 per month. Notably, these "temporary support" payments continued, in the same amount, to the time of trial even though all three children had long since reached the age of

majority. In view of the evidence, we conclude that Wife's assertion that "Husband failed to pay any child support during the pendency of this long divorce action" is simply not correct.

We conclude that Husband more than met his obligation to support his children during the pendency of this divorce. Accordingly, we reverse the trial court's award of $63,200 for "retroactive" child support.

## VI.

Finally, we consider Wife's request for an award of her attorney's fees in this appeal. The decision whether to award attorney's fees incurred on appeal is a matter within the discretion of this Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995); *Seaton v. Seaton*, 516 S.W.2d 91, 93 (Tenn. 1974). Given the issues and results of the litigation as well as the respective financial positions of the parties following their divorce, we deny Wife's request.

## VII.

The judgment of the trial court awarding Wife $63,200 is hereby reversed. Otherwise, the judgment is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of its judgment, as modified, and the collection of costs assessed below. Costs on appeal are taxed to the appellant, Thomas Stuart Layman.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE