IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2019 Session

## LEANN BARNES v. DAVID ELLETT BARNES

**Appeal from the Chancery Court for Bedford County**
**No. 27833     J. B. Cox, Chancellor**

_____

### No. M2018-01539-COA-R3-CV

_____

This is the third appeal to address the issue of alimony between these parties. Pursuant to our decision in the first appeal, Husband was required to pay Wife $6,000 per month in alimony in futuro. In this proceeding, Husband sought termination or reduction of his alimony obligation due to a disability that rendered him unable to work. After Husband filed his petition, he unilaterally reduced the amount of alimony that he paid during the proceeding. Following a hearing, the trial court found that a substantial and material change in circumstances had occurred due to Husband's disability, and the court concluded that a reduction of the alimony obligation was warranted. The trial court reduced the alimony in futuro award from $6,000 per month to $3,900 per month. However, the trial court found Husband in contempt for willfully failing to pay alimony in accordance with the existing order during this proceeding. The trial court awarded Wife a judgment for the arrearage but calculated it based on the reduced rate of $3,900 per month. Wife appeals, asserting that Husband maintains the ability to pay alimony at the previous level of $6,000 per month despite his disability. She also requests recalculation of the arrearage and seeks an award of attorney's fees. For the following reasons, we reverse the decision of the trial court and reinstate the alimony award of $6,000 per month. The arrearage should also be recalculated based on the original award of $6,000 per month plus post-judgment interest. We further conclude that Wife is entitled to an award of attorney's fees on appeal and remand for the trial court to determine an appropriate award. The trial court should reconsider Wife's request for attorney's fees incurred in the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed
and Remanded**

CARMA D. MCGEE, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Leann Barnes.

Daryl M. South and David O. Haley, Murfreesboro, Tennessee, for the appellee, David Ellett Barnes.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Leann Barnes ("Wife") and David Ellett Barnes ("Husband") were married for over twenty-five years. Throughout most of the marriage, Wife worked as a nurse, and Husband worked as a dentist. They lived a lavish lifestyle and accumulated a sizeable marital estate, including numerous real properties, a dental practice, retirement and investment accounts, an airplane, several vehicles, all-terrain vehicles, a motorcycle, a ski boat, and numerous other assets.

Wife filed for divorce in 2009, and the divorce trial was held over the course of five days in April and May 2011. Wife was 48 years old at the time of the divorce trial, and Husband was 50. In the final decree of divorce, each party was awarded a share of the marital estate valued at over one million dollars. The trial court initially awarded Wife alimony in futuro in the amount of $6,000 per month, finding that Husband was making $400,000 per year and that Wife was making around $50,000 per year, and therefore, she was not "able to improve her earnings in such a way that she will keep pace with [Husband's] ability to earn" and "not able to be rehabilitated" within the meaning of the alimony statute. The trial court later granted a motion to alter or amend and modified its alimony award, concluding that its original award was inconsistent with the Tennessee Supreme Court's recently issued opinion in *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011). As a result, the trial court replaced its previous award of $6,000 per month in alimony in futuro until death or remarriage with an award of $4,300 per month in rehabilitative alimony for four years, finding that this would give Wife an opportunity to rehabilitate herself.

On appeal, this Court vacated the trial court's amended order modifying the alimony award and reinstated its original award of $6,000 per month in alimony in futuro, finding that Wife simply could not be rehabilitated within the meaning of the alimony statute. *Barnes v. Barnes*, No. M2012-02085-COA-R3-CV, 2014 WL 1413931, at *30 (Tenn. Ct. App. Apr. 10, 2014) *perm. app. denied* (Tenn. Sept. 18, 2014) ("*Barnes I*"). We discussed in detail each of the statutory factors relevant to the alimony determination. *Id.* at *23-29. Notably, we found that Wife had a monthly gross income of $3,917 and a monthly shortfall of $6,878 per month after payment of her expenses. *Id.* at *25. We were unable to locate in the voluminous record any form of income and expense statement showing Husband's monthly income and expenses, and Husband did not testify

- 2 -

as to his monthly gross income. *Id.* at *25 n.15, *30. However, we noted that Husband received $435,073 in compensation from his dental practice in 2010, the year prior to trial, which would equate to $36,256 per month, and he also received rent from the practice at the rate of $6,000 per month. *Id.* at *30. Thus, in 2010, Husband had received over $500,000 from the practice. *Id.* at *24. We found that Husband's monthly income from compensation and rent "would easily exceed $40,000 per month." *Id.* at *30. Our opinion reinstating the award of $6,000 per month in alimony in futuro was issued on April 10, 2014, and the Tennessee Supreme Court denied Husband's application for permission to appeal on September 18, 2014.

On remand after *Barnes I*, the trial court awarded Wife a judgment for the difference between the alimony awarded in the original decree and that paid by Husband pursuant to the amended decree. In the second appeal to this Court, we only briefly considered the issue of alimony, modifying the trial court's arrearage judgment to also specify that Husband must pay $6,000 per month in alimony in futuro. *Barnes v. Barnes*, No. M2015-01254-COA-R3-CV, 2016 WL 6078562, at *1-2 (Tenn. Ct. App. Oct. 14, 2016) ("*Barnes II*").

By the time our second opinion was issued, however, Husband had already filed a petition to modify or terminate his alimony obligation in the trial court. Husband filed his petition on December 17, 2015, alleging that he had recently had back surgery and carpal tunnel surgery. He alleged that he was no longer able to practice dentistry and that he was experiencing "a financial crisis." Husband claimed that he lacked the ability to pay alimony in futuro at the rate of $6,000 per month, and he asked the court to either reduce or terminate his alimony obligation going forward.

In January 2016, Husband began receiving disability benefits. Wife filed an answer to Husband's petition in which she claimed that Husband maintained the ability to pay alimony at the current rate regardless of whether he was presently employed or not. She also asserted that her need for alimony had not changed and requested an award of attorney's fees for having to defend against the petition. In February 2016, Wife filed a petition for civil contempt, alleging that Husband had paid only $1,000 of his $6,000 alimony obligation for the month of January 2016. Husband filed an answer in which he admitted that he did not pay all of the amount owed for January, but Husband insisted that he did not have the ability to pay the full amount. In June 2016, Wife filed another motion alleging that Husband had only paid her between $500 per month and $1,500 per month since the beginning of 2016. She requested a judgment for $29,500 in unpaid alimony.

Husband's petition to modify and Wife's petition for contempt were tried on May 10, 2018. By that time, Wife claimed that Husband owed her $95,500 in unpaid alimony. Husband and Wife both testified at the hearing, and Husband also presented testimony from his financial planner, an accountant, and an insurance agent.

Husband testified that his taxable income in 2010, the year before the divorce trial, was approximately $500,000. He testified that he continued to practice dentistry thereafter until he underwent numerous surgeries in the fall of 2015. He attempted to return to work but was unable to do so. Husband filed a claim against a disability policy he maintained with a private insurer, and, as mentioned above, he began receiving disability benefits in January 2016. At the time of trial, his disability payment from the private insurer was $19,226 per month. Notably, this income was not subject to federal income taxes.

Husband had also applied for and received Social Security disability benefits. His claim was approved in October 2016 retroactive to April 2016. Husband explained that his private insurer required him to seek Social Security disability, and when he received his first lump sum payment of $33,449 from Social Security, he was required to pay that amount to his private insurer. Husband testified that he was presently receiving a Social Security disability benefit of $2,795 per month. He said that the amount he received from Social Security was deducted from the amount he received from the private insurer. In other words, once Husband started receiving the Social Security disability payments, the monthly amount he received from the disability policy was reduced (by the same amount of the Social Security benefit) to its present level of $19,226.

In April 2016, also while the petition to modify was pending, Husband had sold his dental practice for $950,000. After paying commission and various debts, Husband received $785,994.26 in proceeds from the sale, which he deposited in his bank account. Husband conceded during the hearing that he used this money to pay off most of his debts. Husband paid off three mortgages: a $219,000 mortgage on his residence; a $122,000 mortgage on the dental practice building he still owned; and a $172,000 mortgage on his mother's home. He also paid some other miscellaneous debts, and he contributed $250,000 to an investment account. Husband also sold his airplane while the petition was pending and received a "net" payment of $130,000 from the sale after the payment of commission. He testified that he saved that money and "put it away for retirement."

Husband also received other forms of monthly income. He leased the building where the dental practice operated to the purchaser of the dental practice for $6,000 per month. He also owned property where four mobile homes were located, and those tenants paid a total of $800 in rent per month. However, he had agreed for his mother to receive that rent rather than himself. Husband also received at least $5,000 per year in investment income.

Altogether, Husband calculated his present income at around $27,450 per month and $329,640 per year. Husband testified that this annual sum was about $170,000 less than what he had become accustomed to living on for the past 30 years. Utilizing these

numbers, he insisted that his *gross* income had dropped by at least 34 percent. At the same time, however, Husband acknowledged that he would not owe federal income taxes on the monthly payments he received from his private disability policy, which made up the majority of his monthly income. He would owe federal income taxes on a percentage of his Social Security disability income and his rental income.

Even though Husband admitted to paying off most of his debts, he vaguely testified that he still had the same "fixed expenses" that he had at the time of the divorce, and he said these fixed expenses had increased. However, he did not submit an income and expense statement detailing his monthly expenses. Husband only testified generally about a few isolated expenses. For example, he estimated that about $1,000 of his $6,000 monthly rent check would be used for expenses connected to the rental property, such as insurance, taxes, and maintenance. Husband estimated that he still owed "over $100,000 in debt," which included two car notes, a line of credit, and a $69,000 balance on his mortgage. Husband was remarried, and his wife had an annual income of over $40,000, but he testified that she did not contribute to the household expenses. Husband was insured on his Wife's health insurance policy, but he estimated that he spent $6,000 per year on out of pocket medical expenses. Husband was also financially assisting his parents. He had paid off the mortgage on his mother's home and continued to pay the taxes, insurance, lawn maintenance, and other expenses for the property. He was also contributing $6,000 per month to a personal investment account managed by his financial planner, although he also made withdrawals from the account to pay expenses.

Husband insisted that the only way he could have afforded to pay Wife the full amount of alimony he owed was if he had utilized the proceeds from the sale of the dental practice. However, Husband did not believe that he should have to use the proceeds from the sale of the practice to pay alimony because the dental practice was one of the assets awarded to him during the divorce proceeding.

Husband claimed that his standard of living had plummeted. He testified that he was unable to live "in the same style and fashion" that he enjoyed at the time of the divorce. He initially testified that he could not remember the last vacation he took and estimated that it occurred two years ago. However, on cross-examination, Husband admitted that he had traveled to Florida, California, and Jamaica since his petition to modify was filed. Husband also acknowledged that while his petition to modify was pending, he sold his house with no mortgage for $329,000 and purchased another house for $395,000. (This resulted in Husband having the $69,000 mortgage on his current home.)

Husband testified that his disability had greatly impacted the way he planned for retirement, as he originally planned to work until age 65 or 70 while funding his retirement at the maximum level and reducing his debt. Husband's financial planner, Randall Hartley, testified to this effect as well. He stated that Husband's disability had

caused an "extremely significant" change in his retirement plan, and he opined that Husband's current investment strategy was "significantly worse" than it was before his disability. According to Mr. Hartley, Husband was no longer eligible to contribute to his 401(k) since his disability because he no longer had earned income. As a result, Mr. Hartley and Husband modified his investment strategy such that Husband would contribute to a personal investment account instead of a retirement account. Mr. Hartley confirmed that Husband had been contributing $6,000 per month to this personal account, and he acknowledged that this was double the average amount that Husband contributed while practicing dentistry. Since Husband sold his dental practice two years earlier, he had deposited a total of $470,000 in the personal account, including $120,000 from monthly deposits, $250,000 from the sale of the dental practice, and $100,000 from the sale of his plane. However, Husband had withdrawn $286,000 from the account to pay various expenses. Mr. Hartley testified that if one did not consider the deposits from the asset sales (or related tax withdrawals) and focused solely on Husband's regular deposits and withdrawals, he had withdrawn $13,000 more from this account than he had contributed during that two-year timeframe. Still, Husband maintained a balance of over a million dollars in investments under Mr. Hartley's management.

During cross-examination, Mr. Hartley acknowledged that his testimony about Husband's financial situation was limited in scope to the particular investments Husband maintained under his management and did not encompass other assets or accounts Husband owned. Mr. Hartley also acknowledged that he did not know how Husband spent the money he withdrew from his accounts with the exception of one tax payment. Mr. Hartley noted that he was not "privy to his checkbook." He stated that Husband was "taking out as much as he's putting in," as far as the monthly contributions to these accounts, but he could not testify as to Husband's "capacity to save."

Husband also presented expert testimony from an accountant, Mike Hallum. Husband had directed Mr. Hallum to review his tax returns and analyze his income and "revenue streams." Based on this review, Mr. Hallum testified that Husband's average gross income from 2005 to 2009 (prior to the 2011 divorce trial) was $506,000. Mr. Hallum estimated that Husband's average gross income from 2018 to 2025 would be $333,000. As such, he calculated a 35 percent reduction in Husband's *gross* income since the divorce.

Next, Mr. Hallum testified regarding Husband's so-called "disposable income." From Husband's estimated gross income for 2018 to 2025, Mr. Hallum subtracted Husband's estimated tax liability and his present alimony obligation. Using this method, Mr. Hallum calculated that Husband would have $260,000 in "disposable income" each year, going forward, after the payment of taxes and alimony, to satisfy his remaining obligations. Mr. Hallum calculated Husband's average disposable income from 2005 to 2009, prior to the divorce trial, at $353,000. (These figures pre-dated the divorce decree and did not include the $72,000 deduction for the payment of alimony.) Comparing these

- 6 -

two timeframes, Mr. Hallum estimated that Husband's "disposable income" was presently 26 to 27 percent lower than before the divorce.

On cross-examination, Mr. Hallum again confirmed that Husband's disability policy payments are non-taxable. He explained that Husband would only pay taxes on a portion of his Social Security disability, his rent, and his investment income. Mr. Hallum noted that Husband would now be taxed in the 15 percent tax bracket. For example, according to Mr. Hallum, Husband paid only $8,026 in federal income taxes for 2017 despite having $326,041 in gross income. For 2018, Mr. Hallum calculated Husband's estimated tax liability at only $502 due to the fact that the majority of his income was not subject to income tax.

Wife testified that she was working full-time as a registered nurse, and in the year before the hearing, she had a gross income of $58,000. Her net income after the deduction of taxes, insurance, and other expenses from her paycheck was $34,694. According to her income and expense statement, on a monthly basis, Wife had a gross income of $4,455 and a net income of $2,891. She had no additional source of income besides alimony. Wife listed monthly expenses of $12,426. She testified that she had approximately the same expenses that she had at the time of the divorce. She had one monthly car payment but no mortgage payment. Since the divorce, she had sold the marital residence and bought another residence that cost slightly less.

Wife testified that she had incurred a substantial amount of attorney's fees defending against Husband's efforts to reduce his alimony obligation and pursuing the alimony she was already owed. In addition, she testified that Husband had failed to pay her over $95,000 in alimony he owed. Due to Husband's failure to pay alimony, Wife had cashed out a retirement account and spent her savings in order to pay her monthly expenses and attorney's fees.

After the hearing, the trial court entered a written order granting Husband's petition to reduce the alimony in futuro award but also finding him in contempt for failing to pay alimony as ordered during the proceeding. The trial court found that Husband had become unable to practice dentistry due to a disability and that this "reduced [his] income significantly." It found that Husband could "no longer make what he was making in his practice" and that he had "no ability to replace that income save from income derived from the sale of his dental practice." For the preceding year, 2017, the trial court found that Husband's income from all sources totaled $342,518. According to the trial court, this equated to "an annual reduction of approximately $163,482.00 in income to him."[1] In sum, the court found that this reduction in Husband's

---

[1] The trial court noted that it had some question as to whether Husband might have to reimburse the private insurer for the monthly Social Security benefit he was receiving, and if so, the court noted that his reduction in income would be even greater. However, the proof established that Husband had to repay

gross income "represents a material change in his ability to pay alimony." The court concluded that Husband had proven "a substantial and material change not contemplated at the time of the divorce."

The trial court found that the second prong of its analysis was "more problematic." According to the court, the remaining question was whether Husband met his burden of proving that he had an inability to pay the presently ordered amount of alimony. The court noted that Husband submitted spreadsheets indicating that "his disposable income is less than it used to be," and for 2017, he would have disposable income of $260,000 after the payment of alimony to take care of his remaining obligations. The court noted that the typical statement depicting Husband's monthly income and expenses was not present in the record. The court acknowledged that it had bank records and tax returns before it and that Husband's expert witnesses addressed his retirement planning. However, the court found that Husband's witnesses "did not discuss his day to day expenses and whether [Husband] has a present ability to pay alimony." The court mentioned Husband's testimony that he owes more than $100,000 in debt but also noted that he provided no supporting documentation. Ultimately, the trial court found that Husband's "bank records reveal that generally [he] is spending more than he is taking in." "On balance," the court concluded, "the evidence preponderates in favor of a finding that [Husband] cannot pay the same amount of alimony he has been paying."

The trial court found that Wife's "need" for alimony had "changed somewhat, but she largely shows the same 'need' for alimony as before." It found that her "need" equated to maintaining the lifestyle the parties enjoyed during the marriage, and the court found that Husband had reduced his lifestyle due to his disability. It found that Wife was still the economically disadvantaged spouse and that the reasons for awarding alimony in futuro articulated in *Barnes I* still existed. In conclusion, the trial court stated,

> Since [Husband] can no longer produce the income that he once produced, and that income has been drastically reduced due to his disability, and since the bank records and the tax returns reveal that he does not have the ability to maintain alimony at the present level, [Husband's] alimony obligation is reduced to $3,900.00 per month. This reduction will relate back to the filing of the Petition to Modify the Existing Alimony Award.

In effect, the trial court reduced Husband's alimony obligation retroactive to December 2015.

his insurer with the *first* lump sum payment he received from Social Security, but once he started receiving the Social Security benefits, his monthly payment from the disability policy was reduced by a corresponding amount. Thus, the evidence does not suggest that Husband will have to make further reimbursements to the insurer. Notably, Husband did not testify that any such reimbursement was required or expected. His brief on appeal confirms that "the original disability benefit was reduced by his Social Security disability payment."

Finally, with respect to the petition for contempt, the trial court found that Husband unilaterally reduced his alimony payments beginning in January 2016 without court permission. The court found that Husband's failure to pay his full alimony obligation was willful. The court noted that Husband realized significant proceeds from the sale of his dental practice during this proceeding, which gave him the present ability to pay his alimony obligation, but instead, he paid off the mortgage on his mother's house. The court noted that Husband also had funds in his investment accounts that he could have used to pay his alimony obligation. Utilizing the reduced award of $3,900, the trial court calculated Husband's alimony arrearage at $36,700 and awarded Wife the attorney's fees she incurred in pursuing the contempt petition. Wife timely filed a notice of appeal.

## II. ISSUES PRESENTED

Wife presents the following issues, which we have slightly restated, for review on appeal:

1.  Whether the trial court abused its discretion in reducing Husband's alimony obligation when there was no "substantial" change in his ability to pay because his prior taxable income was essentially replaced with non-taxable disability benefits, he retained over one million dollars in retirement funds, he failed to present proof of his current expenses, and his post-divorce standard of living eclipses that of Wife;

2.  Whether the trial court should have required Husband to pay the alimony arrearage at the full amount of $6,000 per month; and

3.  Whether Wife should be awarded her attorney's fees in both the trial court and this Court when she is the economically disadvantaged spouse and defending against Husband's petition to modify the support obligation.

For the following reasons, we reverse the decision of the chancery court and remand for further proceedings.

## III. STANDARD OF REVIEW

A spousal support decision "is factually driven and involves the careful balancing of many factors." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). As such, "trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Id*. When reviewing a spousal support award on appeal, our role "'is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable.'" *Id*.

(quoting *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)). A decision regarding the modification of an existing alimony award is also factually driven. *Jekot v. Jekot*, No. M2016-01760-COA-R3-CV, 2018 WL 4677676, at \*5 (Tenn. Ct. App. Sept. 28, 2018). Accordingly, a trial court's determination as to whether to modify an alimony award is likewise discretionary. *Id.* When reviewing a reduction in alimony on appeal, "we begin our analysis with the presumption that the trial court's decision to reduce alimony was the correct decision and review the evidence in the light most favorable to that decision." *Jekot v. Jekot*, 362 S.W.3d 76, 80 (Tenn. Ct. App. 2011).

## IV. DISCUSSION

The type of alimony that was awarded to Wife, alimony in futuro, "remain[s] in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances." Tenn. Code Ann. § 36-5-121(f)(2)(A). "The party seeking modification bears the burden of proving that a substantial and material change in circumstances has occurred." *Wiser v. Wiser*, 339 S.W.3d 1, 12 (Tenn. Ct. App. 2010) (citing *Freeman v. Freeman*, 147 S.W.3d 234, 239 (Tenn. Ct. App. 2003)). However, that is not the petitioner's only hurdle. *See Covarrubias v. Baker*, No. E2016-02316-COA-R3-CV, 2017 WL 6276230, at \*4 (Tenn. Ct. App. Dec. 11, 2017) ("A party seeking a modification of alimony in futuro has two significant hurdles to overcome."). "Even if a substantial and material change in circumstances is established, the trial court is under no duty to modify the alimony award[.]" *Church v. Church*, 346 S.W.3d 474, 484 (Tenn. Ct. App. 2010). At that point, the party seeking the modification must demonstrate that modification is warranted considering the factors contained in Tennessee Code Annotated section 36-5-121(i). *Id.*

As the language of the statute reflects, for the first step, it is not enough to simply show a change of circumstances; the change must be both "material" and "substantial." Tenn. Code Ann. § 36-5-121(f)(2)(A); *Woodard v. Woodard*, No. E2017-00200-COA-R3-CV, 2018 WL 3339754, at \*3 (Tenn. Ct. App. July 9, 2018). In this context, a change in circumstances is deemed "material" if it has occurred since the entry of the decree awarding alimony and was not anticipated or within the contemplation of the parties when the decree was entered. *Friesen v. Friesen*, No. E2017-00775-COA-R3-CV, 2018 WL 5791954, at \*2 (Tenn. Ct. App. Nov. 5, 2018). Here, Wife does not dispute that Husband's disability was a "material" change in circumstances, as an unanticipated change occurring since the entry of the decree awarding alimony.

The issue, then, is whether his disability constituted a "substantial" change in circumstances. In an alimony modification case, "a change in circumstances is considered to be 'substantial' when it significantly affects either the obligor's ability to pay or the obligee's need for support." *Friesen*, 2018 WL 5791954, at \*2. When deciding whether a change has significantly impacted an obligor's ability to pay, "it is

inappropriate to focus on one source of income when the party has multiple sources of income." *Jekot*, 362 S.W.3d at 82. Instead, the trial court should examine the obligor's "*total income* from all sources to determine whether there ha[s] been a substantial and material reduction in [the obligor's] ability to pay alimony." *Id.* (emphasis in original); *see, e.g.*, *Harkleroad v. Harkleroad*, No. E2012-01804-COA-R3-CV, 2013 WL 1933024, at *5 (Tenn. Ct. App. May 10, 2013) (finding no substantial and material change where a husband's "previously reported income was almost entirely replaced by his Social Security and retirement benefits"); *Killian v. Killian*, No. M2010-00238-COA-R3-CV, 2010 WL 3895515, at *3 (Tenn. Ct. App. Oct. 5, 2010) (concluding that a husband failed to prove that a medical condition had a substantial and significant impact on his "overall income" where he testified about his income from his law practice but presented no proof about his income from other sources).

Moreover, a change in circumstances may not be deemed "substantial" if the obligor has assets from which he can continue to make alimony payments. *Friesen*, 2018 WL 5791954, at *2 (citing *Osesek v. Osesek*, No. M2011-00984-COA-R3-CV, 2012 WL 729880, at *3 (Tenn. Ct. App. Mar. 6, 2012)). In *Siefker v. Siefker*, No. M2001-01458-COA-R3-CV, 2002 WL 31443213, at *3 (Tenn. Ct. App. Nov. 1, 2002), this Court found no substantial change where the husband's income dropped by more than half but he "retained substantial assets that were untouched." *Id.* at *4. Similarly, in *Osesek*, we recognized that the husband had lost his job but nevertheless held that his "non-income assets" were available to satisfy his alimony obligation. 2012 WL 729880, at *5.

On appeal, Wife argues that Husband failed to prove a "substantial" change in his ability to pay alimony because he now receives a substantial amount of nontaxable disability benefits that have essentially replaced his net income from the dental practice. Wife also argues that Husband retained a substantial amount of assets from which he could have paid his alimony obligation.

Again, the trial court found that Husband's disability "reduced [his] income significantly" and that Husband can "no longer make what he was making in his practice." The trial court referenced the calendar year prior to the hearing, 2017, and found that Husband's income from all sources, including the disability policy, Social Security disability, rent, and investment income, totaled $342,518. According to the trial court, this equated to "an annual reduction of approximately $163,482.00 in income to [Husband]," based on his pre-divorce average gross income of $506,000. Ultimately, the court found that this reduction in Husband's *gross* income "represents a material change in his ability to pay alimony." The trial court's order included no mention of Husband's non-income assets at this stage of the analysis. It clearly found a material change in Husband's ability to pay alimony based solely on Husband's reduction in gross income. We agree with Wife that Husband owns substantial assets that could be used to satisfy his alimony obligation, yet the trial court failed to consider those assets in its consideration of whether a significant change occurred with respect to Husband's ability to pay

alimony. This Court has held that "'[a] significant decrease in income may not constitute a substantial and material change in circumstances if the obligor owns assets that can be liquidated and the obligee's need for the payments has not diminished.'" *Lane v. Lane*, No. M2008-02802-COA-R3-CV, 2009 WL 3925461, at \*7 (Tenn. Ct. App. Nov. 17, 2009) (quoting *Siefker*, 2002 WL 31443213, at \*3).

We also find the trial court's sole reliance on the reduction in Husband's *gross* income to be problematic given that the pivotal issue is whether Husband's disability significantly impacted his "ability to pay." Husband's expert opined that there was a "very significant" difference between Husband's gross income before the divorce and his present gross income. Specifically, he testified that Husband's average gross from 2005 to 2009 was $506,000, and his projected average gross income for 2018 to 2025 would be $333,000. As a result, he testified that Husband's gross income had dropped by 35 percent. The trial court was apparently swayed by that testimony because it ultimately reduced Husband's alimony obligation from $6,000 per month to $3,900 per month. Although the trial court did not provide any explanation for why or how it chose that number, by our calculation, it reduced the alimony award by exactly 35 percent. However, the evidence presented does not suggest that Husband's reduction in gross income reduced his *ability to pay alimony* by 35 percent.

Husband's expert conceded that when Husband earned income from his dental practice, he paid federal income taxes on that sum at a much higher tax rate of around thirty percent. According to the expert's own spreadsheet, from 2005 to 2009, Husband paid an average of $150,204.80 per year in federal income taxes. However, for the second period of years that he uses for comparison, 2018 to 2025, Husband will pay federal income taxes of no more than $1,380. In summary, according to the spreadsheet, Husband did have an average gross income of $506,000 for 2005 to 2009, but he owed around $150,000 in federal income taxes, so he had an after-tax income of around $356,000. According to the spreadsheet, Husband's average gross income going forward is $333,000, but his after-tax income is around $332,000.[2] Using these numbers, it becomes clear that Husband's disability has not significantly impacted his "ability to pay" nearly as much as suggested by Husband's expert and his emphasis on "gross income." The trial court also focused on the reduction in gross income without mentioning the huge disparity between Husband's tax liability before and after his

---

[2] It also appears that Husband's after-tax income for 2018 to 2025 will actually exceed $332,000. In his spreadsheet, Husband's expert did not include the *total* amount of rent Husband receives in his calculation of Husband's "gross income." Instead of using the $6,000 per month lease rate, he included only $5,000 per month labeled as "Net Rental Cashflow." Thus, the chart lists only $60,000 in annual rental income for Husband, not $72,000. This $12,000 shortage would increase Husband's after-tax income from $332,000 to $344,000. The expert also failed to include any lease income from the trailers leased at $800 per month, or $9,600 per year, likely because Husband permitted his mother to receive that income. However, the trial court included the trailer rent in its calculation of Husband's gross income for 2017.

disability.

Aside from the issue of income, we are also concerned about the lack of evidence regarding Husband's expenses. Again, we must examine Husband's "ability to pay" alimony, not just his income. *See Malkin v. Malkin*, 475 S.W.3d 252, 261 (Tenn. Ct. App. 2015) ("Deciding whether an obligor has the ability to provide spousal support requires consideration of more than the obligor's income.") A decrease in income cannot be viewed in a vacuum, as the obligor's expenses are another important factor for consideration. *Id.*

As Wife notes on appeal, we have no income and expense statement detailing Husband's monthly income and expenses in a way that would easily enable us to determine whether he has the ability to pay $6,000 per month in alimony. To make matters worse, we have little testimony about Husband's expenses. Husband made a few references to debts he owes, including two car notes and a $69,000 mortgage (on a house worth $395,000). He also mentioned some monthly expenses, such as medical bills and expenses for the dental building. But without a comprehensive description or even estimation of Husband's expenses, we are unable to engage in the type of analysis that is needed to determine Husband's ability to pay.

We recognize that Husband's expert prepared a spreadsheet entitled "Husband's Ability to Pay Support," and he testified about Husband's annual "disposable income" and how that figure has decreased since the divorce. But again, these numbers are problematic. The expert testified that Husband had an average "disposable income" of $353,000 before the divorce and that he presently has an average "disposable income" of only $260,000. The obvious difference in these figures comes from the fact that his post-divorce disposable income calculation deducts $72,000 in alimony, while this sum is not deducted from the pre-divorce figure. In other words, the main difference between Husband's disposable income now and before the divorce is the fact that he pays alimony. This cannot constitute a substantial and material change in circumstances for the purpose of alimony modification.[3]

If we omit the deduction for alimony, the expert's numbers show that Husband had "disposable income" of $353,000 per year prior to the divorce and "disposable income" of $332,000 per year after the divorce. This equates to a present disposable income of $27,666 per month. According to the expert, this is the sum that Husband has

---

[3] An obligor made a similar argument in *Jekot*, 362 S.W.3d at 83, claiming that his expenses had increased dramatically since the divorce due to his obligation to pay $108,000 per year in alimony. He complained that his alimony obligation had greatly affected his income and his ability to save for retirement. *Id.* On appeal, we explained that this "alimony expense" argument was meritless and not material for purposes of the petition to modify. *Id.* Instead of an *unanticipated* change occurring *since* the divorce decree, the alimony obligation was mandated *in* the divorce decree and contemplated when the order was entered. *Id.*

left after the payment of taxes to fulfill all of his obligations. Unfortunately, we do not know what obligations and expenses Husband has to know whether this sum is sufficient. Husband may be spending more than he is saving, at least so far as his financial planner knows. However, for the most part, we do not know what Husband's expenditures are or whether they are reasonable. More importantly, the issue before us is not whether Husband's disability has significantly impacted his ability to save for retirement. The evidence presented by Husband simply does not establish that his disability has substantially affected his ability to fulfill his existing alimony obligation. To the contrary, the proof shows that Husband has continued to make substantial contributions to his personal investment account, financially support his parents, and purchase a larger home for himself and his current wife.

Ultimately, we find no factual basis in the record that would support a finding that Husband's change in circumstances was substantial within the meaning of the alimony statute. Husband has failed to prove that his disability had a significant impact on his ability to pay alimony. Consequently, we reverse the trial court's decision to decrease Husband's alimony in futuro obligation and reinstate the original alimony award of $6,000 per month. If Husband has been paying $3,900 per month while this case has been pending on appeal, Wife is entitled to recover the difference between what Husband paid and what he would have paid had the obligation remained at $6,000. Because the trial court's alimony arrearage judgment was also based on the erroneously reduced alimony obligation, we also reverse the arrearage award and remand with instructions for the trial court to recalculate the arrearage judgment based on the award of $6,000 per month plus post-judgment interest.

Wife also requests an award of her attorney's fees in the trial court and on appeal. The trial court awarded Wife her attorney's fees incurred in connection with the petition for contempt but did not award her the fees incurred in connection with the petition to modify, as Wife was not successful in defending against the petition in the trial court. Wife asserts that she should be awarded her attorney's fees because she is the disadvantaged spouse, and she has had to deplete her resources defending against Husband's attempts to reduce his alimony obligation.

At the time of trial,[4] Tennessee's Enforcement of Orders statute, Tenn. Code Ann. § 36-5-103(c), provided, in relevant part:

> The plaintiff spouse may recover from the defendant spouse . . . reasonable attorney fees incurred in enforcing any decree for alimony and/or child support . . . both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom

---

[4] The statute was amended effective July 1, 2018, but the amendment applies "to actions commenced on or after that date." 2018 Tenn. Laws Pub. c. 905.

such action or proceeding is pending, in the discretion of such court.

This statute "authorizes courts to award reasonable attorney's fees to the prevailing party in an action to enforce any decree for alimony, child support, or child custody." *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). The decision to award such attorney's fees "is largely within the discretion of the trial court and [], absent an abuse of discretion, appellate courts will not interfere with the trial court's finding." *Id.*

"With regard to cases involving post-divorce alimony disputes, Tenn. Code Ann. § 36-5-103(c) clearly authorizes a recovery of reasonable attorney's fees incurred in enforcing an order awarding alimony." *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586, at *12 (Tenn. Ct. App. Aug. 23, 2004) (citing *Brewer v. Brewer*, 869 S.W.2d 928, 936 (Tenn. Ct. App. 1993)). This Court has long held that the statute "authorizes a court to award attorney's fees to an alimony recipient who is forced to defend an action to reduce or terminate that alimony." *See id.*; *see, e.g., Friesen*, 2018 WL 5791954, at *3; *Jarman v. Jarman*, No. M2017-01730-COA-R3-CV, 2018 WL 5778811, at *5-7 (Tenn. Ct. App. Oct. 31, 2018); *Hauf v. Hauf*, No. M2015-00736-COA-R3-CV, 2016 WL 4523230, at *4 (Tenn. Ct. App. Aug. 26, 2016); *Malkin*, 475 S.W.3d at 263; *Owens v. Owens*, No. M2012-01186-COA-R3-CV, 2013 WL 3964793, at *6 (Tenn. Ct. App. July 30, 2013) *perm. app. denied* (Tenn. Nov. 13, 2013).

"The statute authorizes awards of attorney's fees incurred at trial as well as on appeal." *Malkin*, 475 S.W.3d at 263. Deciding whether to award attorney's fees incurred on appeal pursuant to this statute is a matter within the discretion of this Court. *Id.* However, as this Court has previously observed,

> 'Alimony is only awarded in the first instance to an economically disadvantaged spouse who has a demonstrated need for the support. Absent a showing in a modification proceeding that the need no longer exists, requiring the recipient to expend that support for legal fees incurred in defending it would defeat the purpose and public policy underlying the statute on spousal support. Additionally, the possibility of being burdened with a former spouse's attorney's fees helps deter unwarranted or unjustified attempts by an obligor to evade or reduce an existing support obligation.'

*Henderson v. Henderson*, No. M2013-01879-COA-R3-CV, 2014 WL 4725155, at *12 (Tenn. Ct. App. Sept. 23, 2014) (quoting *Evans*, 2004 WL 1882586, at *13).

In light of the issue presented on appeal, Wife's success on appeal, and the respective financial positions of the parties, we exercise our discretion to grant Wife's request for an award of her reasonable attorney's fees and expenses incurred on appeal. The trial court should determine a reasonable fee for appellate work on remand.

Generally, regarding fee awards made by the trial court, "under section 36-5-103(c), the Court of Appeals' standard of review is abuse of discretion for both the issue of whether the party is entitled to an award and the issue of the amount of the fees awarded." *Eberbach*, 535 S.W.3d at 479 n.7. Here, Wife was not initially successful in defending against Husband's petition to modify in the trial court, but we have reversed the trial court's decision on appeal. In *Hauf*, 2016 WL 4523230, at *3-4, an alimony recipient who unsuccessfully defended against a petition to modify in the trial court similarly asked this Court, in the event that we reversed the trial court, to award her the attorney's fees she had incurred in the trial court defending against the petition to modify. We said:

> Wife was forced to defend Husband's petition to modify his alimony obligation, and on appeal, has been successful. In light of our reversal of the trial court's decision, we reverse the portion of the court's order requiring each party to pay its own attorney's fees and remand the matter for the trial court to reconsider the appropriateness of an award of reasonable attorney's fees to Wife in accordance with Tenn. Code Ann. § 36-5-103(c)[.]

We will follow the same course of action and give the trial court the opportunity to exercise its discretion in the first instance.

## V.  CONCLUSION

For the aforementioned reasons, the decision of the chancery court is reversed and remanded for further proceedings. Costs of this appeal are taxed to the appellee, David Ellett Barnes, for which execution may issue if necessary.

_____
CARMA D. MCGEE, JUDGE